Filed 10/30/14  P. v. Walker CA1/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>　　　　Plaintiff and Respondent,<br><br>v.<br><br>THELMEAS WALKER, JR.<br><br>　　　　Defendant and Appellant. | A134924<br><br>(Alameda County<br>　Super. Ct. No. C166404) |

This is an appeal from judgment after a jury convicted appellant Thelmeas Walker, Jr. of forcible rape during a residential burglary, which crime he accomplished by personal use of a firearm.  Appellant challenges the judgment on grounds that include violation of his constitutional right to avoid cruel and unusual punishment, erroneous admission of evidence and instruction to the jury, and failure to strike or vacate the finding on a lesser-included offense.  We remand this matter to the trial court to correct a minor sentencing error, and in all other regards affirm the judgment.

### FACTUAL AND PROCEDURAL BACKGROUND

On July 8, 2011, an information was filed charging appellant with one count of forcible rape (Pen. Code, § 261, subd. (a)(2); (count one); and one count of residential burglary (Pen. Code, § 211; count two).[1]  These crimes were alleged to have been committed against the victim, Jane Doe, on November 30, 2001, when appellant was a few months shy of his 17th birthday.  With respect to count one, it was alleged appellant

---

[1]　　　Unless otherwise stated, all statutory citations herein are to the Penal Code.

1

committed the crime while engaged in a residential burglary (§§ 460, subd. (a)/667.61, subds. (a), (b), (e)(2)), and at the age of 14 years or older (Welf. & Inst., § 602, subd. (b)). As to both counts, it was alleged that appellant personally used a firearm (§§ 667.61, subd. (e)(4), 12022.3, 12022.5, 12022.53, subds. (b), (g)). Count two was subsequently dismissed on statute-of-limitations grounds, and the case proceeded to trial on count one only. At trial, the following evidence was produced.

## I. The Prosecution's Case.

At about 9:45 p.m. on November 30, 2001, Doe was upstairs in her two-story Oakland house preparing to meet a friend for a drink. Her son, Joe, and godson, Vernon, also residents of the house, were out for the evening. As Doe was descending the stairs from the second floor, a masked male appeared, "flipped" her jacket over her head, and put a gun to her head as he spun her around. Doe learned from her brief glimpse of this male before the jacket was placed over her head that he was African-American and carrying a black automatic pistol.

Doe immediately threw her hands up as the male said, "Give it here." It sounded to Doe as if the male was attempting to disguise his voice by lowering it "an octave." The male led Doe upstairs, stopping when they reached her son's room to reach his hand in to turn on the light, look around, and then turn off the light. This led Doe to believe the male was somehow familiar with her house. As she later explained, the light in her son's room is old and atypical, requiring the user to "reach and twist the bottom part of it" and "a half circle [to] turn it on, and you twist it a half circle to turn it off."

The male led Doe to her bedroom, where he pushed her to the floor next to the bed with the jacket still covering her head. He dumped out her purse and then opened a dresser drawer before demanding that she, "Take it off." Doe thus began to remove the straps of the overalls she was wearing. However, she struggled with the task due to the jacket over her head. The male, becoming impatient, pulled her overalls down himself in a quick motion, scratching her leg as he did so. With the gun still in his hand, the male used his left hand to remove Doe's clothing and underclothing. Doe then heard him remove his own belt and pants before attempting to put his penis into her vagina. At first,

2

his penis was not sufficiently erect to perform intercourse, but eventually he completed his task, "pump[ing] inside" of her vagina four or five times before pulling up his pants and running downstairs in the dark.

At trial, Doe testified that she not scream or resist this intruder because he had a gun. Doe did not feel the male ejaculate, although she believed he may have because "it was so fast." Doe also stated the size of his penis did not seem that of a grown man. After the attack, Doe remained in her bedroom, listening for the front door to open and the porch to make its creaking noise so she could be sure he had left. She did not hear any such noises, but she eventually got up to call her friend, Irene, who promptly came to Doe's house with her son. She also called her own son before then calling the police to report the attack. An officer was dispatched to her residence at 11:35 p.m.

When Doe, Irene and Irene's son later searched the house, they noticed the door from the kitchen to the washroom was open, as was the door from the washroom to the backyard. Doe acknowledged that she often left her house unlocked, as it was common for her son, godson and their friends to congregate there.

Later that night, Doe went to the hospital, where she underwent a sexual assault examination. This examination revealed that Doe had a three-millimeter tear in her posterior fourchette that was consistent with sexual assault. As a sexual assault nurse explained at trial, "right on that posterior fourchette is where forced penetration would occur. So, in an attempt to force penetration, that tissue would be split and open." Generally, this sort of injury heals in a healthy woman of child-bearing age within 72 hours. Doe also had redness of the cervix, known as a cervical erythema, which was consistent with many causal factors, including blunt trauma or a sexually transmitted disease.

DNA from sperm collected from Doe's vaginal swab matched appellant's type, with just one in 5.6 quintillion members of the population having the same genetic profile. This sperm, which derived from a sample appellant submitted in connection with

3

another criminal matter in 2010, made up the "major donor profile."[2] There was an additional DNA profile consisting of two "minor alleles" that did not match appellant or Doe, and was consistent with Doe's trial testimony that she had engaged in consensual sexual intercourse with another individual within 72 hours of the exam.

Doe acknowledged at trial that, in 1999, she engaged in "street prostitution" and that, in 2001, she still engaged in prostitution, but only with "regular" clients (not "street" clients). The man she had intercourse with within 72 hours of the attack was not a paying client.

Doe was shocked when she discovered several years after her attack that appellant had been identified as a suspect in her case. Even though it was years later, she began to cry when learning this news. Doe had known appellant for many years, as he was the same age as her teenage son, and had attended elementary, middle, and a few years of high school with him. Moreover, appellant had been a visitor in her home numerous times over the years, even spending the night on several occasions. In fact, "If he was over and it got late, he only lived around the corner on Shattuck. So he would spend the night during school nights and get up in the morning, go get his clothes for school, and go on to school with the rest of the other kids." Appellant was at Doe's house so often that the door would sometimes be left unlocked for him.

Doe's son likewise confirmed that appellant was his "close friend," who he met in elementary school. Appellant had stayed at Doe's house many times, and had frequently been in Doe's son's bedroom. Doe produced several photographs taken at her house that included appellant, her son and other friends.

At the time of Doe's attack, appellant had only recently stopped coming over to her house as a result of a rule she followed that disallowed boys who were "messing up" from visiting. In appellant's case, Doe had learned that, sometime in the Fall of 2001, he had dropped out of school, thereby triggering her house rule. He was the only one of her

---

[2]     Appellant was identified as the contributor based on a convicted offender sample after the sperm fraction from Doe's vaginal swab was entered into CODIS at the laboratory.

son's friends to stop coming to her house after November 2001.  She saw him a few times after the attack, including twice on Shattuck, at which times he had crossed to the other side of the street and avoided her glance.  She had never had consensual sex with appellant.

Officer Tisdell interviewed appellant on April 10, 2010, after his DNA sample was determined to be consistent with the DNA profile of the sperm from Doe's vaginal swab.  Appellant told the officer he was a loner with few friends.  Appellant claimed to have had just one friend as a youth named James, who lived on Shattuck.  When shown a photograph of Doe, appellant denied knowing her or having sex with her.  Appellant also denied recognizing a photograph of Doe's house and, when told of its address, denied knowing where the street was located.  After being told his sperm matched the profile of a male who had raped Doe, appellant insisted it was not possible, but offered that he had engaged in oral sex with a prostitute on San Pablo Boulevard at age 15.

## II.    The Defense Case.

Doe acknowledged that she failed to initially tell police that the male who attacked her wore a mask, although she did state that she did not see his face.  Nor did Doe initially report that she saw the male's gun or that he turned on, then off, the light in her son's room.  She did report that she did not believe the male ejaculated during the rape.  Doe could not tell how tall the male was because she was a few steps up from him on the staircase when he flipped her jacket over her head.

Appellant testified in self-defense, denying that he committed the crime in question.  On November 30, 2001, the date of Doe's attack, he was about two weeks from his 17th birthday.  Appellant had never raped anyone or committed armed burglary.  Appellant claimed to have been truthful when he denied to Officer Tisdell that he recognized Doe.  However, by the time of trial, he did believe he knew her despite failing to recognize her photograph:  "[W]hen she came to court and I heard her speaking, I

5

started remembering her then."[3]  Moreover, appellant remembered by the time of trial that he had engaged in sexual intercourse with Doe, but insisted it occurred consensually on San Pablo Avenue.  He explained that, after running into each other in the middle of the day, they "worked out a little proposition" whereby he gave her drugs and money in exchange for oral copulation and intercourse.  Appellant did not recognize Doe as his friend Joe's mother until they began to speak, but he then agreed to keep the affair secret.  During intercourse, he recalled ejaculating, but only after removing his penis from her vagina to avoid pregnancy.  Appellant subsequently saw Doe around the neighborhood, but did not try to avoid her.

Appellant did not recognize Doe's photograph during the police interview in 2010 because she had blond braids at the time, so appeared different.  Appellant also acknowledged that he knew Doe's son, Joe, but insisted on direct examination that he was just an acquaintance. On cross examination, appellant admitted attending elementary, middle, and some of high school with Joe.  He dropped out of high school in the Fall of 2001.  He may have been to Joe's house, but was sure he had never spent the night.

Although appellant went to prison on a gun charge, he testified on direct examination that he did not have a gun in 2001.  On cross-examination, he admitted possessing a firearm when he was a minor, and he admitted buying a semi-automatic weapon in 2002 for protection, which he possessed until 2004.  He also admitted a 2003 conviction for selling a controlled substance.

## III.    The Jury Verdict, Sentencing and Appeal.

On January 26, 2012, the jury found appellant guilty as charged and found true both enhancements.  A sentencing hearing was held March 16, 2012, at which the trial court imposed a prison term of 25 years to life for the crime of forcible rape committed during a residential burglary with intent to commit rape (§ 667.61, subd. (d)(4)), with a consecutive 10-year term for his personal use of a firearm.  The trial court relied upon

---

[3]     Appellant explained that during the police interview, "[his] mind was somewhere else.  [He] didn't think [about it] at the time.  [His] mind was focused on something else."  Seeing Doe in court refreshed his memory.

6

section 654 to "stay" punishment with respect to the jury's finding of guilt on the lesser-included offense of committing rape during a burglary. (§ 667.61, subd. (e)(2).) This timely appeal followed.

## DISCUSSION

Appellant raises the following issues on appeal. First, appellant contends his total sentence of 35 years to life violates the Eighth Amendment prohibition on cruel and unusual punishment because it effectively imposes on him a life sentence without possibility of parole for a juvenile nonhomicide offense without consideration of his prospects for rehabilitation. Second, appellant contends the trial court prejudicially erred in admitting expert testimony relating to rape trauma syndrome. Third, appellant contends the trial court committed instructional error when charging the jury that, to prove he committed forcible rape, the prosecution need not prove he ejaculated. Fourth, appellant contends the trial court further erred when responding to a jury question regarding when appellant may have harbored an intent to commit rape. And, lastly, appellant contends, and the People concede, the trial court erred by staying, rather than striking or vacating, the lesser-included offense of committing rape during a burglary in violation of section 667.61, subdivision (e)(2). We address each issue in turn.

## I.     Imposition of the 35-Years-to-Life Sentence.

Appellant, two weeks from his 17th birthday on the date of his crime, contends the trial court violated the Eighth Amendment by sentencing him to 35 years to life in prison – what he says is the equivalent of a life sentence without possibility of parole (LWOP) – without first considering his prospects for rehabilitation. Appellant thus requests remand of this matter to permit the trial court to consider the factors set out in *People v. Caballero* (2012) 55 Cal.4th 262, relating to his rehabilitative potential. (See also *Graham v. Florida* (2010) 560 U.S. 48 [*Graham*] [observing that juvenile nonhomicide offenders have "twice diminished moral culpability" compared to adult homicide offenders due to the less severe moral implications of the crime and to juveniles' lesser developed moral sense].)

7

The People respond, first, that appellant should have raised his Eighth Amendment claim in a petition for writ of habeas corpus filed in the trial court rather than in this court and, second, in any event, that his sentence does not amount to a LWOP given his eligibility for parole by age 61, a point at which he would still have a meaningful opportunity for life outside prison assuming a life expectancy of 77 years.[4] The People thus conclude the trial court did not run afoul of *People v. Caballero*'s command to consider a juvenile's prospects for rehabilitation before imposing a life or de facto life sentence. (See *People v. Perez* (2013) 214 Cal.App.4th 49, 52, 57-58 [rejecting Eighth Amendment challenge to the 30-years-to-life sentence received by a 16-year-old rapist eligible for parole at age 47 on the ground that "no rule of constitutional jurisprudence . . . *requires discretion* to reduce penalties when minors are sentenced for adult crimes to periods which still leave them a substantial life expectancy after release"].)

For reasons discussed below, we agree with the People's second argument that no Eight Amendment violation exists on this record because appellant will have significant remaining life expectancy upon the date of his eligibility for parole. As such, we need not consider the People's alternative argument that appellant relied upon the wrong procedural vessel in making his Eight Amendment challenge. We thus turn to the substantive law governing this issue.

*People v. Caballero*, a case involving a juvenile nonhomicide offender receiving a sentence of 110 years to life, instructs: "Although the state is by no means required to guarantee eventual freedom to a juvenile convicted of a nonhomicide offense, *Graham* holds that the Eighth Amendment requires the state to afford the juvenile offender a 'meaningful opportunity to obtain release based on demonstrated maturity and

---

[4] The People rely on statistics from the United States Social Security Administration Actuarial Life Table (www.ssa.gov/oact/STATS/table4c6.html) (hereinafter, SSA statistics) to argue appellant's life expectancy as an American male is approximately 77 years. Appellant, on the other hand, relies on statistics from the Center for Disease Control and Prevention, U.S. Decennial Life Tables (as of June 8, 2011) (hereinafter, CDC statistics) to argue his life expectancy as a black American male born in 1984 is approximately 64 years.

rehabilitation,' and that '[a] life without parole sentence improperly denies the juvenile offender a chance to demonstrate growth and maturity.' (*Graham, supra*, 560 U.S. at p. __ [130 S.Ct. at pp. 2029-2030].) The court observed that a life without parole sentence is particularly harsh for a juvenile offender who 'will on average serve more years and a greater percentage of his life in prison than an adult offender.' (*Id.* at p. __ [130 S.Ct. at p. 2028].) *Graham* likened a life without parole sentence for nonhomicide offenders to the death penalty itself, given their youth and the prospect that, as the years progress, juveniles can reform their deficiencies and become contributing members of society. (*Ibid.*)"[5] (*People v. Caballero, supra,* 55 Cal.4th at p. 266.)

Following this reasoning, the California Supreme Court ultimately held that, "sentencing a juvenile offender for a nonhomicide offense to a term of years with a parole eligibility date that falls outside the juvenile offender's natural life expectancy constitutes cruel and unusual punishment in violation of the Eighth Amendment. Although proper authorities may later determine that youths should remain incarcerated for their natural lives, the state may not deprive them at sentencing of a meaningful opportunity to demonstrate their rehabilitation and fitness to reenter society in the future. Under *Graham*'s nonhomicide ruling, the sentencing court must consider all mitigating circumstances attendant in the juvenile's crime and life, including but not limited to his or her chronological age at the time of the crime, whether the juvenile offender was a

---

[5]    "The high court stated that nonhomicide crimes differ from homicide crimes in a 'moral sense' and that a juvenile nonhomicide offender has a 'twice diminished moral culpability' as opposed to an adult convicted of murder—both because of his crime and because of his undeveloped moral sense. (*Graham, supra*, 560 U.S. at p. __ [130 S.Ct. at p. 2027].) The court relied on studies showing that 'developments in psychology and brain science continue to show fundamental differences between juvenile and adult minds. For example, parts of the brain involved in behavior control continue to mature through late adolescence. [Citations.] Juveniles are [also] more capable of change than are adults, and their actions are less likely to be evidence of "irretrievably depraved character" than are the actions of adults.' (*Id.* at p. __ [130 S.Ct. at p. 2026], quoting *Roper v. Simmons* (2005) 543 U.S. 551, 570 [161 L.Ed.2d 1, 125 S.Ct. 1183].) No legitimate penological interest, the court concluded, justifies a life without parole sentence for juvenile nonhomicide offenders. (*Graham*, at p. __ [130 S.Ct. at p. 2030].)" (*People v. Caballero, supra*, 55 Cal.4th at p. 266.)

9

direct perpetrator or an aider and abettor, and his or her physical and mental development, so that it can impose a time when the juvenile offender will be able to seek parole from the parole board. The Board of Parole Hearings will then determine whether the juvenile offender must be released from prison 'based on demonstrated maturity and rehabilitation.' (560 U.S. at p. __ [130 S.Ct. at p. 2030].) Defendants who were sentenced for crimes they committed as juveniles who seek to modify *life without parole or equivalent de facto sentences* already imposed may file petitions for writs of habeas corpus in the trial court in order to allow the court to weigh the mitigating evidence in determining the extent of incarceration required before parole hearings." (*People v. Caballero, supra*, 55 Cal.4th at pp. 268-269 [italics added].)

In so holding, the high court recognized "every case will be different," and thus did "not provide trial courts with a precise timeframe for setting these future parole hearings in a nonhomicide case." (*People v. Caballero, supra*, 55 Cal.4th at p. 269.) However, it made clear "the sentence must not violate the defendant's Eighth Amendment rights and must provide him or her a 'meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation' under *Graham*'s mandate." (*Ibid.*)

Here, as the parties acknowledge, appellant's 35-years-to-life sentence was the statutorily-mandated sentence for committing the crime of forcible rape during a residential burglary by personal use of a firearm. (§ 667.61, subds. (a)-(e); see also *People v. Estrada* (1997) 57 Cal.App.4th 1270,1274-1275.) For sentencing purposes, this statutory scheme draws no distinction between adult and juvenile offenders. This means, in practical terms, that appellant, just shy of age 17 when he committed the crime and age 27 when sentenced, will be eligible for parole at age 55 years, if all possible post-conviction credits are considered.[6] Thus, assigning appellant a normal life expectancy as

---

[6]    As stated in appellant's opening brief: "Appellant was granted 813 days credit against his term pursuant to Penal Code section 2933.1, leaving 11,962 days [35 years multiplied by 365 days equals 12,775 days] of the 35 year term before eligibility to be considered for parole. Postconviction credits would also be limited to 85% pursuant to

an American male born in 1984 of somewhere between 64 and 77 years (see fn. 4, *ante*), he would have between 9 and 22 years of freedom if awarded parole at the time of his initial eligibility.

Having considered this reality, we cannot accept appellant's claim that the sentence in this case is the functional equivalent of a LWOP, the "exceedingly rare" category of sentences imposed upon juvenile offenders of nonhomicide crimes that the *Graham* court was concerned with. (*Graham, supra*, 560 U.S. at p. 67.) Otherwise stated, appellant has failed to establish in this case that he lacks a realistic opportunity to earn his release by demonstrating his achievement of maturity and rehabilitation at a future parole hearing occurring within the reasonable confines of his life expectancy. As such, *Graham, supra,* 560 U.S. 48 and its progeny are simply inapposite. (Cf. *People v. Mendez* (2010) 188 Cal.App.4th 47, 57, 62-63 [a 16-year-old juvenile's 84 years-to-life sentence was the functional equivalent of LWOP, and thus violated the 8th Amendment, where he would not be eligible for parole until age 88, beyond his 76-year life expectancy]; *People v. Caballero, supra,* 55 Cal.4th at p. 268 [a 16-year-old juvenile's 110 years-to-life sentence was the functional equivalent of LWOP, and thus violated the 8th Amendment, because he would not be eligible for parole during the period of his life expectancy].

Accordingly, we conclude appellant's sentence does not violate the Eight Amendment's prohibition on cruel and unusual punishments because his parole eligibility date, when he is 55 years old, does not fall outside his natural life expectancy, which, according to reliable data from federal agencies of the United States government, would be 64 to 77 years.[7] As such, we decline appellant's request for remand for resentencing under *People v. Caballero*.

---

Section 2933.1; thus leaving 10,402 days [11,962 days equals 10,402 days actual plus 15%], or 28.5 years, before appellant may be considered for parole. Appellant was 27 years old on the date sentence was pronounced. [Citation.] Appellant will not be eligible *to be considered* for parole until September of the year 2040, when he is 55 years old."

[7]   This conclusion also disposes of appellant's largely redundant "additional and alternative argument" that, even if his sentence is not the legal equivalent of a LWOP,

## II. Admission of Evidence Regarding Rape Trauma Syndrome.

Appellant further argues the trial court erred to his prejudice in admitting into evidence the testimony of Marcia Blackstock, an expert on rape trauma syndrome (RTS). Specifically, Blackstock, who acknowledged having no familiarity with or opinions about the facts of this particular case, testified that RTS is a term used to describe a rape victim's emotional and physical reactions to the rape. Blackstock described RTS as having three phases: the acute crisis, reorganization, and assimilation phases. The acute crisis phase usually lasts for two weeks to two months after the rape and begins with feelings of denial. The victim, who often knows her attacker, may experience shock, extreme fear, shame, helplessness or powerlessness. The reorganization (or life-changing) phase may then begin, during which the victim tries to feel and appear normal. Some victims are never able to move beyond this phase. The last phase is assimilation, during which the victim accepts the rape and begins to address its emotional repercussions.

Blackstock, whose expertise is not challenged, also provided the following information regarding victims' reactions to having been raped. She explained most do not fight back, scream or otherwise resist for fear of provoking violence. In fact, many victims experience a "super human calmness" shortly after the attack, likely due to shock. The emotional responses of shock, fear, or shame may also lead the victim to either fail to report, or delay reporting, the rape. It is also common for a victim to be unable or unwilling to recall details about the rape because doing so is "too painful" or too close to

---

remand is nonetheless required because his sentence nonetheless violates the Eighth Amendment "as a life sentence imposed on a juvenile for a nonhomicide offense without due consideration of the prospects for rehabilitation and thus 'forswears altogether the rehabilitative ideal' of juvenile law." In the words of our appellate colleagues from the Fourth District, Division Three, and consistent with our holding set forth above, "There is a bright line between LWOP's and long sentences *with* eligibility for parole *if* there is some meaningful life expectancy left when the offender becomes eligible for parole. We are aware of—and have been cited to—no case which has used the *Roper-Graham-Miller-Caballero* line of jurisprudence to strike down as cruel and unusual any sentence against anyone under the age of 18 where the perpetrator still has substantial life expectancy left at the time of eligibility for parole." (*People v. Perez, supra,* 214 Cal.App.4th at p. 57.)

reliving the experience. Most rapists, on the other hand, are motivated by a need for power or control rather than sexual gratification.

The trial court admitted this expert testimony over defense objections after finding it relevant to address the common myths or misconceptions that lay jurors have with respect to rape and its victims. Appellant challenges this ruling on the grounds that Blackstock's testimony was unnecessarily broad, highly inflammatory and prejudicial. The following legal principles apply.

Generally, all relevant evidence is admissible, including expert testimony that "would assist the tier of fact." (*People v. Champion* (1995) 9 Cal.4th 879, 922, 925; Evid. Code, § 801.) Relevant evidence is that which has any tendency in reason to prove or disprove any disputed fact material to the outcome of the case. (Evid. Code, § 210.) "The test of relevance is whether the evidence tends ' "logically, naturally, and by reasonable inference" to establish material facts such as identity, intent, or motive. [Citations.]' [Citation.] The trial court has broad discretion in determining the relevance of evidence [citations] but lacks discretion to admit irrelevant evidence. [Citations.]' [Citation.]" (*People v. Hamilton* (2009) 45 Cal.4th 863, 940.) Moreover, even relevant evidence may nonetheless be excluded if the trial court finds that its probative value is substantially outweighed by its prejudicial effect. (*People v. Champion, supra,* 9 Cal.4th at p. 922; Evid. Code, § 352.)

On appeal, a trial court's decision to admit or exclude evidence is reviewed solely for abuse of discretion. (*People v. Brown* (2003) 31 Cal.4th 518, 547; *People v. Avitia* (2005) 127 Cal.App.4th 185, 193.) With respect to a ruling on expert testimony, an abuse of discretion will be found where "the evidence shows that a witness *clearly lacks* qualification as an expert . . . ." (*People v. Chavez* (1985) 39 Cal.3d 823, 828.) More generally, "[t]he trial court's ruling will not be disturbed in the absence of a showing it exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a miscarriage of justice. [Citation.]" (*People v. Avitia, supra,* 127 Cal.App.4th at p. 193. See also *People v. Dyer* (1988) 45 Cal.3d 26, 73.)

13

Having considered the record at hand, we find nothing arbitrary, capricious, or patently absurd about the trial court's admission of the challenged evidence. (*People v. Avitia, supra,* 127 Cal.App.4th at p. 193.) Specifically, California courts have long recognized that, under certain circumstances, expert testimony on RTS is admissible where it may help jurors understand the evidence in a particular case. As the California Supreme Court explains: "In a number of the cases in which the issue has arisen, the alleged rapist has suggested to the jury that some conduct of the victim after the incident — for example, a delay in reporting the sexual assault — is inconsistent with her claim of having been raped, and evidence on rape trauma syndrome has been introduced to rebut such an inference by providing the jury with recent findings of professional research on the subject of a victim's reaction to sexual assault. [Citations.] As a number of decisions have recognized, in such a context expert testimony on rape trauma syndrome may play a particularly useful role by disabusing the jury of some widely held misconceptions about rape and rape victims, so that it may evaluate the evidence free of the constraints of popular myths." (*People v. Bledsoe* (1984) 36 Cal.3d 236, 247-248. Accord *People v. McAlpin* (1991) 53 Cal.3d 1289, 1300-1301.) In *People v. Bledsoe*, the testimony on RTS did not, in fact, serve the "useful role" of rebutting common misconceptions about rape victims because, there, the victim "promptly reported the attack, immediately exhibited the type of severe emotional reaction that the normal lay juror would associate with rape and suffered bruises and other physical injuries that corroborated her claim that she had been violently assaulted." Instead, the RTS testimony was relied upon, improperly, "as a means of proving — from the alleged victim's post-incident trauma — that a rape in the legal sense had, in fact, occurred." Accordingly, the California Supreme Court held that admission of the testimony was error. (*People v. Bledsoe, supra,* 36 Cal.3d at p. 248.)

Our case, however, differs. As the court explained in admitting the RTS testimony: "Now, Miss Doe, the victim in this case, was examined extensively on both the direct and cross-examination. And on cross-examination, she was examined, again, extensively about her behavior and her actions following the commission of the offense,

14

the alleged offense. And the sequence of phone calls that the fact that she did not call the police first, that she called her girlfriend, Miss Feaster, lady acquaintance, Miss Feaster, and Miss Feaster responded to Miss Doe's apartment was a subject of considerable examination by [defense counsel]. And I am not in any way saying that was inappropriate examination. [¶] Nevertheless, it did occur. And there was some question left, I think, or potential question left in the minds of the jurors as to why she did not call the police first. And then perhaps friends and relatives and so on. And that was the subject of questions, as I have said, posed to her by [defense counsel]. That being the case, I think it is an appropriate circumstance as I ruled earlier in our in limine motions to allow the District Attorney to provide the testimony of what I will call the rape trauma expert to disabuse the jury of some widely held misconceptions about rape and rape victims. And one of those misconceptions may very well be the inference that was left with the jury because of the cross-examination of the victim. And that it, that although she had, she alleges that she had been raped at gunpoint in her own home, she didn't call the police first. She called a friend and the friend responded. And only after that call and the response to the friends were the police called."

The trial court's observations and reasoning accord with the record. In particular, the trial court accurately notes the depth of Doe's examination and cross-examination with respect to her actions following the commission of the crime, including her decision to initially call a friend for help rather than the police. As such, the trial court had a reasonable basis for concluding Blackstock's RTS testimony was appropriate in this case to help the jury fairly and rationally consider the evidence relating to Doe's reactions to being raped, free of commonly-held misconceptions. (See *People v. Pelayo* (1999) 69 Cal.App.4th 115, 120-121 [on appeal, the court must consider the challenged evidence, and reasonable inferences that may be drawn from it, in a light most favorable to affirming the judgment].) We therefore uphold the trial court's admission of this testimony as a proper exercise of discretion.

Finally, even if we were to assume for the sake of argument that admission of the RTS testimony was erroneous, there would remain no basis on this record for reversing

15

given the lack of any legitimate basis for finding appellant thereby harmed.  Indeed, the trial court instructed the jury quite clearly and comprehensively regarding its restricted use of the RTS testimony not once, but twice.  This instruction, given before Blackstock testified and then again at the conclusion of evidence, stated:

"Evidence will be presented to you concerning what we have termed the rape trauma syndrome. This evidence is not received and must not be considered by you as proof that the alleged victim's claim of rape is true.

"Rape trauma syndrome research is based upon an approach that is completely different from that which you must take in this case.  The syndrome research begins with the assumption that a rape has occurred and seeks to describe and explain common reactions of females to that experience.  As distinguished from that research approach, you are to presume the defendant innocent.  The People have the burden of proving guilt beyond a reasonable doubt.  You should consider the evidence concerning the syndrome, that is rape trauma syndrome and its effect only for the limited purpose of showing, if it does, that the alleged victim's reactions as demonstrated by the evidence, are not inconsistent with her having been raped."[8]

We presume, as we must, that the jury properly discharged its duty to follow the court's instruction.  (E.g., *People v. Ramos* (2008) 163 Cal.App.4th 1082, 1089 ["we assume, as we must, that ' " 'the jurors [were] intelligent persons and capable of understanding *and correlating* all jury instructions . . . given . . .' "].)  Appellant offers no evidence to the contrary.  Accordingly, not only did the trial court properly admit the RTS testimony, even assuming otherwise, there was no reasonable chance appellant suffered undue prejudice as a result.  The trial court's ruling thus stands.

## III.    Instruction Regarding the Lack of a Need to Prove Ejaculation.

Appellant next contends the trial court erred when instructing the jury pursuant to CALJIC No. 10.00 that, to prove he committed forcible rape, the prosecution  need not

---

[8]     The jury was also given all standard criminal instructions, including those governing consideration of evidence admitted for a limited purpose and of expert testimony.

16

prove he ejaculated.[9]  In so contending, appellant acknowledges this instruction accurately reflects California law in that proof of ejaculation is not an element of the crime of rape.  (See *People v. Clark* (2011) 52 Cal.4th 856, 957-958 [condoning instruction under CALJIC No. 10.00 that "[a]ny sexual penetration, however slight, constitutes engaging in an act of sexual intercourse. Proof of ejaculation is not required"].)  Instead, appellant contends instructing the jury that proof of ejaculation is not required, an element of CALJIC No. 10.00 appearing in brackets, while legally accurate, "deprived [him] of his right to have the jury instructed consistent with his theory of the case because it instructed jurors that a key fact of [his] defense – lack of ejaculation by the actual perpetrator – was not relevant to the crime of rape."  Thus, appellant reasons, "by telling jurors that 'ejaculation' did not matter, the instructions told the jurors appellant's defense did not matter."  We disagree.

As reflected in his argument, appellant's defense at trial was that the rapist did not ejaculate when raping Doe at her house on November 30, 2001, and that the presence of his sperm in Doe's vaginal swab stemmed from their act of consensual sex after he engaged her services as a prostitute on San Pablo Avenue.  However, appellant ignores the "long-standing general rule . . . that the failure to request clarification of an instruction that is otherwise a correct statement of law forfeits an appellate claim of error based upon the instruction given."  (*People v. Rundle* (2008) 43 Cal.4th 76, 151, disapproved on other grounds in *People v. Doolin* (2009) 45 Cal.4th 390.)  Here,

---

[9]  Consistent with CALJIC No. 10.00, the jury was instructed as follows:

"The defendant is accused in Count 1 of having committed the crime of rape in violation of section 261, subdivision (a)(2) of the Penal Code.

"Every person who engages in an act of sexual intercourse with another person who is not the spouse of the perpetrator accomplished against that person's will by means of force, violence, duress, menace, or fear of immediate and unlawful bodily injury to that person is guilty of the crime of rape in violation of . . .  section 261, subd[.] (a)(2).  [¶] "Any sexual penetration, however slight, constitutes engaging in an act of sexual intercourse. *Proof of ejaculation is not required.*  [¶] Against that person's will means without the consent of the alleged victim . . . ."  The italicized phrase appears in brackets in the actual standardized instruction.  (See CALJIC No. 10.00, italics added.)

appellant is correct in suggesting that "a defendant has a right to an instruction that pinpoints the *theory* of the defense." (*People v. Panah* (2005) 35 Cal.4th 395, 486.) However, his counsel merely challenged the need to include the identified portion of CALJIC No. 10.00 in the instruction, but did not request a clarifying instruction based upon his theory regarding the rapist's failure to ejaculate. Under these circumstances, we agree with the People that appellant's failure to request that the trial court clarify, by means of a pinpoint instruction, the relevance of "proof of ejaculation" on this record forfeited his claim on appeal pursuant to the general forfeiture rule set forth above. (*People v. Rundle, supra,* 43 Cal.4th at p. 151. See also *People v. Guiuan* (1998) 18 Cal.4th 558, 570 [" 'Generally, a party may not complain on appeal that an instruction correct in law and responsive to the evidence was too general or incomplete unless the party has requested appropriate clarifying or amplifying language' "].)[10]

Second, appellant also ignores another relevant set of well-established rules – to wit, that, when considering a claim of instructional error, we must consider the instructions as a whole, assuming jurors are intelligent persons capable of understanding and correlating all jury instructions given and interpreting them, if at all reasonably possible, so as to support the judgment rather than defeat it. (*People v. Ramos, supra,* 163 Cal.App.4th at pp. 1088-1089.) Here, it is beyond dispute the trial court gave all standard instructions regarding the prosecution's burden of proof and the permissible inferences to be drawn from the evidence. These instructions, collectively, diminished any risk that the jury would misunderstand the particular instruction that "proof of ejaculation is not required" to mean that the prosecution should be held to some lesser burden of proof or that certain evidence should not be considered. Indeed, by its terms, the challenged portion of the instruction did not explicitly or implicitly tell the jury to draw any particular inference from the evidence relating to the presence of appellant's sperm in Doe's vaginal swab. Nor did it tell the jury how or whether to regard such evidence. (Cf. *People v. Panah, supra,* 35 Cal.4th at p. 486 ["court must . . . refuse an

---

[10]   We need not comment for purposes of this case how a proper pinpoint instruction on appellant's lack-of-ejaculation theory should be drafted.

argumentative instruction, that is, an instruction 'of such a character as to invite the jury to draw inferences favorable to one of the parties from specified items of evidence' "].) Rather, consistent with California law, the instructions as a whole permitted, but did not require, jurors to find appellant guilty in the absence of proof of ejaculation so long as, based on all the evidence presented, the People proved guilt beyond a reasonable doubt. We have no reason to doubt the jury diligently followed these commands. (See *People v. Stitely* (2005) 35 Cal.4th 514, 554-555 [rejecting defense argument that, absent a definition of sexual intercourse, the jury may have improperly used evidence of anal penetration to convict him of rape murder].)

Thus, considered in the proper context of the jury charge as a whole, we conclude there is no reasonable likelihood the jury misapplied the court's instruction on CALJIC No. 10.00 in a way that could have affected appellant's substantive rights. (See *People v. Frye* (1998) 18 Cal.4th 894, 957 [" ' "a single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge. [Citations.]" ' "].) Appellant has therefore provided no basis for disturbing the judgment.

## IV. Trial Court's Response to Jury Inquiry Regarding Appellant's Intent to Commit Rape.

Appellant next contends the trial court erred when responding to a question submitted by the jury during deliberations regarding when appellant may have harbored an intent to commit rape. The governing law is not in dispute.

"[S]ection 1138, which requires the court to provide the jury any desired information 'on any point of law arising in the case[,]' . . . imposes a 'mandatory' duty to clear up any instructional confusion expressed by the jury." (*People v. Gonzalez* (1990) 51 Cal.3d 1179, 1212.) However, where "the original instructions are themselves full and complete, the court has discretion under section 1138 to determine what additional explanations are sufficient to satisfy the jury's request for information." (*People v. Gonzalez, supra,* 51 Cal.3d at p. 1213.)

Here, the specific question submitted by the jury was as follows:

19

"If we find he did not intend to rape her when entering the house but did intend to rape her when entering the bedroom[,] are we to find him guilty on Penal Code 667.61(d)(4). "If the above is too specific the same rephrased does intent occur entering the house or can it occur as he enters the bedroom.

The instruction we are debating is: [¶] 1. The defendant entered an inhabited (house [or a room within an inhabited house].)"  (Brackets and parentheses in original.)

The trial court, after hearing argument and accepting proposed language from counsel, ultimately responded to jurors as follows:

 "The applicable instructions are:  CALJIC 10.00, defining forcible rape, found at pages 32-33 of your package of instructions; and CALCRIM 3178, which addresses the allegation that the crime of forcible rape occurred during the commission of a burglary, pursuant to Penal Code section 667.6 l (d)(4), which is found at pages 36 and 37 of your package of instructions.

"The latter instruction, CALCRIM 3178, relating to Penal Code section 667.61(d)(4), states, in pertinent part:

"To prove this allegation, the People must prove that:

    1.The defendant entered an inhabited house (or a room within an inhabited house);

    2. When the defendant entered the house (or room within the house, he intended to commit Forcible Rape); [¶]  AND

    3. After the defendant entered the house (or room within the house) he committed Forcible Rape. [¶] [Emphasis added].

"You are instructed that, even if you find that the defendant did not have the intent to commit Forcible Rape at the time he initially entered the house (or if you are unable to determine whether the defendant had such intent at the time he initially entered the house), but if you find that the defendant thereafter formed the intent to commit Forcible Rape and had such intent at the time he entered an inhabited room within the house (such as the bedroom), and if you find that, after entering such inhabited room with such intent, he then committed Forcible

20

Rape, you may find that the allegation described in instruction number 3178, referring to Penal Code section 667.61(d)(4), is true."

In claiming the trial court's response was improper, appellant reasons that, by "instructing [the jury] that they could convict appellant if he formed the intent to commit rape after he entered the home but before he entered the bedroom, [the court] failed to tell the jury the other half of the equation, that *if the intent to rape was formed after entry of the bedroom it did not satisfy the element of rape-during-a-burglary-with-the-intent-to-commit rape* set forth in the sentencing clause (§§ 261(a)/667.61(d)(4))[.]" (Italics added.)

Appellant's argument is undermined by the instruction itself, given to the jury originally and again when the trial court offered its clarifying response, which, quite simply, told the jury exactly what appellant claims was omitted – to wit, that appellant must have harbored the requisite intent at the time he entered either the house or the inhabited room within the house where he, after entry, committed the rape. Specifically, to repeat the relevant portion of the record, the instruction stated that, to prove appellant committed forcible rape during a burglary, "the People must prove [among other things] that: [¶] . . . [¶] 2. *When the defendant entered the house (or room within the house*, he intended to commit Forcible Rape . . . ." Nothing more by way of explanation was required. (*People v. Gonzalez, supra,* 51 Cal.3d at pp. 1212-1214.) Even assuming the trial court could have provided additional guidance on this issue, given that the original instructions were themselves full and complete and that the subsequent response, which both counsel helped to prepare, correctly addressed the jurors' concern, the trial court was not required to do so. (*People v. Davis* (1995) 10 Cal.4th 463, 522.) Otherwise stated, the trial court properly exercised its statutory duty under section 1138 and, thus, neither error nor prejudice occurred.

## IV.     The Finding that Appellant Committed the Lesser-Included Offense of Rape During a Burglary Must be Vacated.

Finally, appellant argues, and the People concede, that the trial court erred by staying, rather than striking or vacating, the jury's finding that he committed the lesser-

21

included offense of rape during a burglary (§ 261/667.61, subd. (e)(2)). Appellant reasons that this lesser-included offense was necessarily included in the offense for which he was sentenced – to wit, rape during a burglary with intent to commit rape (§ 261/667.61, subd. (d)(4)) – in that both offenses arose out of the same act or course of conduct and were established by the same evidence. Appellant is correct. As the California Supreme Court recently explained: "When a defendant is found guilty of both a greater and a necessarily lesser included offense arising out of the same act or course of conduct, and the evidence supports the verdict on the greater offense, that conviction is controlling, and the conviction of the lesser offense must be reversed. [Citations.]" (*People v. Sanders* (2012) 55 Cal.4th 731, 736.)

Accordingly, this matter must be remanded for the limited purpose of correcting this error by vacating the finding that appellant committed the lesser included offense of rape during a burglary in violation of section 667.61, subdivision (e)(2).[11]

### DISPOSITION

This matter is remanded for the limited purpose of vacating the finding of guilt as to the section 667.61, subdivision (e)(2) offense of committing rape during a burglary. In all other regards, the judgment is affirmed.

_____
Jenkins, J.

We concur:

_____
McGuiness, P. J.

_____

---

[11] Our decision in this regard renders moot appellant's remaining arguments relating to the trial court's instruction on the section 667.61 offenses.

22

Siggins, J.